USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/20/2026

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X

Rodney Bethea,

Plaintiff,

-against-

William Lee,

Defendant.

---------------------------------------------------------------X

19-cv-05520-VB-VR

**REPORT & RECOMMENDATION**

VICTORIA REZNIK, United States Magistrate Judge

**TO THE HONORABLE VINCENT L. BRICCETTI**, United States District Judge:

## I. INTRODUCTION

Rodney Bethea, pro se and incarcerated, petitions the Court for a writ of habeas corpus under 28 U.S.C. § 2254. In April 2011, Bethea was convicted of the crimes of first-degree manslaughter, in violation of section 125.20(1) of the New York Penal Law Code, and third-degree criminal possession of a weapon, in violation of section 265.02(1) of the New York Penal Law Code. (ECF No. 20-29 at 99–102).[1] He was then sentenced to serve a determinate term of imprisonment of 25 years for the first-degree manslaughter conviction and an indeterminate term of $2\frac{1}{3}$ to 7 years for the third-degree criminal possession conviction, with the terms to run concurrently. (ECF No. 20-30 at 17–18).

[1] All page numbers for documents filed on ECF refer to the blue ECF numbering at the top of the page.

Bethea's two convictions stemmed from his alleged killing of Ed Gordon during a fight that started at a house party on Sylvester Court in the Town of Newburgh (the Sylvester Court house). According to the State's case at trial, Bethea and Gordon had a physical fight inside the house, and Gordon was removed from the house and left through the front door. Bethea then left through the back door, walked around the side of the house, confronted Gordon in front of the house, and struck him with a baseball bat multiple times.

Bethea's § 2254 petition asserts three claims: (1) the Appellate Division erred when it determined that the trial court committed a harmless error in admitting certain DNA evidence and statements made by Bethea to police after he invoked his right to counsel; (2) he received ineffective assistance of trial counsel; and (3) he was denied a fair trial because he never received notice under section 710.30 of the New York Criminal Procedure Law that the State was going to introduce identification evidence against him. (ECF No. 2 at 11–13). This petition is before me under an Order of Reference dated June 24, 2019.[2] (ECF No. 9). For the reasons below, I respectfully recommend that Your Honor deny the petition in its entirety.

[2] This petition was reassigned to the undersigned on September 18, 2023. (ECF 9/18/2023, Notice of Reassignment).

## II. BACKGROUND[3]

### A. Pretrial Proceedings

#### 1. The Indictment and Omnibus Motion

In December 2010, Bethea was indicted and charged with five counts: one count of second-degree murder, one count of first-degree manslaughter, one count of second-degree manslaughter, one count of third-degree criminal possession of a weapon, and one count of petit larceny. (ECF No. 20-1 at 2–3).

Bethea made a pretrial omnibus motion seeking, among other things, to dismiss the first, second, and third counts of the indictment as facially insufficient under section 200.50 of the New York Criminal Procedure Law. (*Id.* at 12, 23–27). He also sought to preclude "any and all identification evidence" because of a lack of notice required by section 710.30(3) of the New York Criminal Procedure Law, and to suppress the admissions, confessions, and tangible evidence that the police obtained after his arrest. (*Id.* at 12, 27–29, 30–37). The State opposed the motion (*id.* at 75–83), and Bethea submitted reply papers in which he reiterated his arguments about dismissal, lack of notice, and suppression. (*Id.* at 85–90).

By decision and order dated February 14, 2011, the motion was partially granted. (*Id.* at 92–95). Bethea's request to dismiss the first three counts of the indictment was denied and his request to preclude identification testimony was

[3] Unless otherwise indicated, the information in this section stems from the instant petition (ECF No. 2), Bethea's memorandum of law in support (ECF No. 3), the State Court record, i.e., exhibits from the state court proceedings that have been submitted by the State (ECF Nos. 20-1 to 20-30), the State's affidavit and memorandum of law in opposition (ECF Nos. 18, 19), and Bethea's reply papers (ECF No. 24).

denied with leave to renew at trial. (*Id.* at 93). But his request to suppress certain physical evidence and statements he made to police was granted to the extent that a suppression hearing was scheduled. (*Id.* at 93–95).

**2. The Suppression Hearing**

The suppression hearing occurred over the course of four days in March 2011. (ECF Nos. 20-13 at 15–77; 20-14 at 1–79). During that hearing, Bethea sought to suppress his statements to the police and the physical evidence they collected. (ECF Nos. 20-13 at 21–22; 20-1 at 30–37). The court heard testimony from several witnesses, including Richard Pretsch, a detective with the Town of Newburgh Police Department. (ECF Nos. 20-13 at 15–77; 20-14 at 1–79). Pretsch testified that he visited Bethea's residence on the morning after the party ended. (ECF No. 20-13 at 42–48). According to Pretsch, Bethea agreed to speak with the police back at the police station and was placed in a police vehicle without handcuffs. (*Id.* at 49–53). After Bethea made some initial statements to Pretsch in the vehicle, Pretsch pulled over and read Bethea his *Miranda* rights. (*Id.* at 54–57). Pretsch then proceeded to ask Bethea if he would "tell us what . . . happened last night." (*Id.* at 57–58). Bethea responded and explained his version of the events at the party. (*Id.* 58–63). Upon arriving at the police station, Bethea was placed in an "interview room," where he was again read his *Miranda* rights. (*Id.* at 64; ECF No. 20-2 at 6). Bethea then continued speaking with police. (ECF No. 20-13 at 66–67). During that conversation, Bethea "made reference to an attorney." (*Id.* at 69–70). Pretsch left the room to confer with an Assistant District Attorney and another officer about

whether that constituted "an actual request for an attorney" and continued questioning Bethea after it was determined not to be an invocation of counsel. (*Id.*).

After the witness testimony was finished and all parties rested, the court asked if oral argument on the issues was necessary. (ECF No. 20-14 at 77). Bethea declined and stated that his arguments stood on the record and his papers, in which he argued that the court should suppress all of his statements to the police and the physical evidence they collected (*Id.*; ECF No. 20-1 at 30–37).

By decision and order dated May 13, 2011, Bethea's motion to suppress was denied in its entirety. (ECF No. 20-2 at 2–7). The trial court declined to suppress the statements Bethea made to the police before being advised of his *Miranda* rights because it concluded that those statements were made spontaneously, not in response to any question or statement made by police. (*Id.* at 5–6). It also declined to suppress the statements Bethea made after being advised of his *Miranda* rights while seated inside the police vehicle and later inside the interview room because he made a "knowing, intelligent[,] and voluntary waiver" of those rights. (*Id.* at 6–7). And it declined to suppress the physical evidence at issue because it was seized incident to Bethea's lawful arrest. (*Id.* at 7).

### 3. Additional Proceedings Regarding Identification Evidence

Before jury selection, at an appearance before the trial judge, Bethea renewed his request to preclude any identification evidence after he was informed by the State that it intended to introduce identification testimony from witnesses Marques and Marquis Garner. (ECF No. 20-15 at 19–21). Bethea argued that the

State violated sections 710.30 and 710.53 of the New York Criminal Procedure Law by failing to provide notice of this identification evidence within the mandatory period. (*Id.*). The State maintained in opposition that it did not serve any section 710.30 notices for these two witnesses because that was not the common practice. (*Id.*). Instead, the information was provided to Bethea to alert him and the trial court of the need for a "minor hearing" to determine whether the process for obtaining that information was unduly suggestive. (*Id.*). Bethea's request was denied and the Court stated that a short discussion would be had on the morning that the Garners were expected to testify. (*Id.* at 21).

**B. Jury Trial and Subsequent Motion Practice**

**1. The State's Opening Statement**

The prosecutor made an opening statement after Bethea declined to make one. She began by setting the scene, describing how Bethea chased down an unarmed Gordon and struck him in the head with a baseball bat. (ECF No. 20-18 at 18–20). She explained that the jury would hear testimony from forensic scientists and eyewitnesses who either attended the party or lived nearby. (*Id.* at 20). She highlighted forthcoming physical evidence, DNA evidence, and statements made by Bethea to the police, including those he made after he invoked his right to counsel. (*Id.* at 22–27).

### 2. The State's Case-in-Chief[4]

As part of its case-in-chief, the State presented testimony from eight witnesses who either attended the party, lived nearby, or saw Bethea after the party ended. It also played Bethea's recorded confession, presented testimony from two detectives that investigated the incident, and presented expert testimony from two forensic scientists. Below is a summary of the key witnesses and evidence presented.

***<u>Testimony of Shekira Clark</u>***

Ms. Clark was one of the attendees at the party attended by Bethea and the murder victim Gordon, and testified as follows. Clark conceded that she had multiple drinks while at the party but was not intoxicated as a result. (ECF No. 20-19 at 18). She identified Bethea in the courtroom and stated that he attended the party as well. (ECF No. 20-18 at 38–39). At some point after she arrived, Bethea and Gordon got into an argument and Gordon was asked to leave. (*Id.* at 41–44). After Gordon left the party and things returned to normal, she saw Bethea enter the party through the front door of the house. (ECF No. 20-19 at 2–3). Although she never saw Bethea leave the house, she reiterated that she saw him enter while looking "[l]ike something happened" (*id.* at 4) and generally proclaim, "Go get your boy. He's sleeping, or something like that." (*Id.*). She did not see anything in Bethea's hands when he came through the front door. (*Id.* at 5). She looked outside

[4] The following explanation of the State's case-in-chief is only a summary of the key witnesses and evidence presented at trial. It does not include extraneous testimony from various police officers, paramedics, and other individuals who testified.

and saw Gordon lying on the driveway of the house. (*Id.* at 5). As she went to attend to Gordon, Bethea exited the house, ran down the driveway, and proceeded to kick and stomp Gordon in the head several times before driving off in a vehicle with his girlfriend. (*Id.* at 6–9). When asked whether she saw a bat inside the house, she stated that one was located behind the front door. (*Id.* at 12–13).

***Testimony of Bernard Wimes***

Bernard Wimes, the owner of the Sylvester Court house, also testified as part of the State's case-in-chief. (ECF No. 20-20 at 2–73). Despite stating that he had "[a] lot" to drink during the party, he corroborated much of the testimony provided by Clark earlier. (*Id.* at 23). He was present at the party, identified Bethea, and confirmed Bethea was also at the party. (*Id.* at 2–16). He also witnessed people trying to break up an argument between Bethea and Gordon, and asked Gordon to leave the party. (*Id.* at 20–22). Marquis Garner, one of Gordon's friends, helped Gordon exit the party through the front door. (*Id.* at 22).

Shortly thereafter, he saw a couple people come through the front door and explain that someone was lying on the ground outside, which he later discovered was Gordon. (*Id.* at 24–25). Wimes never saw Bethea leave the house, until later when he saw Bethea get into a car with his girlfriend. (*Id.* at 26–28). When shown a photograph of an umbrella rack behind the front door with a baseball bat inside it, he confirmed that the bat is always there. (*Id.* at 36–38). Wimes later texted Bethea

that Gordon was not breathing and that Bethea should take it "easy" because people were talking about enacting revenge. (*Id.* at 41–43).[5]

***Testimony of Marquis and Marques Garner***

Marquis and Marques Garner, twin brothers that attended the house party, also testified. (ECF No. 20-20 at 74–100; 20-21 at 1–25). Marques referred to Bethea as his "best friend," someone he had known his entire life. (ECF No. 20-20 at 75–77). When Marques arrived at the Sylvester Court house, he spoke to Bethea and went outside to smoke marijuana with him, Marquis, and another friend. (*Id.* at 88–89). Marques became aware of the argument between Bethea and Gordon, and instantly took Gordon outside so he could get a ride home. (*Id.* at 93–96). Marques then went back inside the house to collect his jacket. (*Id.* at 96). After being inside for just a few minutes, he witnessed Bethea come to the front door and exclaim that he just hit Gordon with a bat, although he did not see a bat in Bethea's hands. (*Id.* at 97–98). He never saw Bethea after that point. (ECF No. 20-21 at 1).

During his testimony, Marquis stated that he had "a lot" to drink at the party. (*Id.* at 12). Although he failed to remember exactly how many drinks he had, he described himself as "[i]ntoxicated." (*Id.* at 15). He saw the argument between Bethea and Gordon inside the house, and helped restrain Bethea while Gordon was escorted outside the house. (*Id.* at 16–18). Two or three minutes after Gordon left, Marquis witnessed Bethea walk in the front door holding a bat and drop it on the

---

[5] Robert Klein, an investigator with the New York State Police, confirmed that these text messages, and others, were sent between Bethea and Wimes after Klein examined Bethea's cell phone. (ECF No. 20-24 at 42–57).

floor. (*Id.* at 19–20). Marquis never saw Bethea leave the house after the argument and never noticed that Bethea was no longer inside. (*Id.* at 18–19). As Bethea walked through the door, he allegedly stated, "I hit him with the bat." (*Id.* at 20). Marquis saw Bethea leave the house and never saw him again. (*Id.* at 22). When asked whether he talked to the police officer at the scene, Marquis said no. (*Id.* at 22). He explained that he was intoxicated and "really didn't know what happened." (*Id.*) He emphasized that he only knew what happened inside the house and "did not know what happened outside of the house." (*Id.* at 23).

***Testimony of Carnell Hinson***

Carnell Hinson, another partygoer, testified that he had four drinks before he left to go to the party. (ECF No. 20-22 at 25). After he arrived at the Sylvester Court house, he had three additional drinks and was feeling "passed tipsy." (*Id.* at 28, 31). Bethea arrived shortly after he did. (*Id.* at 28). He identified Bethea as the defendant based on his conversations with Bethea and seeing him around town. (*Id.* at 20–21). He also saw the commotion caused by the argument between Gordon and Bethea. (*Id.* at 28–29).

Gordon walked out the front door and it closed behind him. (*Id.* at 29–30, 56–57). Bethea then exited alone through the back door a few minutes later, with nothing in his hands. (*Id.* at 29–30, 61; ECF No. 20-23 at 2–3). Hinson saw a crowd of people leaving through the front door and followed them. (ECF No. 20-22 at 32). Once outside, he saw Bethea swing a bat three or four times "[t]owards the ground area" and Gordon on the ground. (*Id.* at 32–34, 47). Bethea proceeded to walk past

Hinson back towards the house. (*Id.* at 36, 49).[6] Hinson walked down the street, away from the house, and was later picked up by his wife. (*Id.* at 35).

***Testimony of Lisa and Tiquon Tate***

Lisa and Tiquon Tate lived near the Sylvester Court house. (ECF No. 20-23 at 7, 42). Both heard a commotion outside their house on the night of the incident and saw the events unfold from a bedroom window. (*Id.* at 12–13, 46). There was one light above the garage, one above the front door, and a streetlight. (*Id.* at 37–38). The light above the garage was activated by motion, but the one above the front door was not. (*Id.* at 37–38). The garage light and streetlight were on, with the garage light illuminating the driveway, but Lisa was unsure if the front door light was on. (*Id.* at 39–40, 61–62). Lisa and Tiquon confirmed they had no trouble viewing the events that took place, but Tiquon did state that it was difficult to make out people's faces because of the lighting. (*Id.* at 40, 61).

Lisa saw a man being chased down a driveway by a second man with a bat. (*Id.* at 15). She described the bat as silver and made of aluminum; and she confirmed the bat placed into evidence looked like the one she saw on the night of the incident. (*Id.* at 36). She further testified that the first man being chased down the driveway tripped, at which point the second man with the bat caught up to him and hit him in the back of the head with the bat. (*Id.* at 16). She saw the first man fall to the ground and the second man with the bat continue to hit him four or five

[6] Hinson made contradictory statements regarding whether Bethea had a bat in his hands as he passed Hinson on his way back to the house. On direct examination, Hinson testified that Bethea did not have the bat. (ECF No. 20-22 at 36). But on cross-examination, he stated Bethea was still holding the bat at that time. (*Id.* at 49).

more times. (*Id.* at 16–20). Once the second man stopped swinging the bat, Lisa left the room briefly and called 911. (*Id.* at 21–22). When she returned to the room, she saw the second man walk back down the driveway from the house with nothing in his hands, walk over to the body and kick and stomp the first man on the ground, enter a vehicle with two or three other people, and drive away. (*Id.* at 22–25).

Tiquon corroborated some, but not all, of Lisa's testimony. He saw a man by himself yelling at the front door to be let inside, with no other people outside. (*Id.* at 48, 56). He testified that he then saw "the door open and another gentleman runs out the door and he runs down the steps." (*Id.* at 48). Then, "the gentleman that was originally at the door, entered the house for a second and comes out with an object that looked like a bat and gave chase." (*Id.*). The first man fell to the ground while running down the driveway and the second man with the bat hit him in the back of the head, taking roughly seven or eight swings of the bat followed by several kicks. (*Id.* at 48–53). Tiquon identified the second man with the bat as being about six feet, four inches tall, and weighing 265 pounds. (*Id.* at 51). After the second man with the bat walked back up the driveway into the house, he exited it again with nothing in his hands, walked towards the first man and kicked him again, took something from the first man's pockets, and left the area in a vehicle. (*Id.* at 54–55). Tiquon was asked whether other people were outside while the man with the bat hit the man on the ground, and he said "No, there wasn't anyone outside." (*Id.* at 56).

***Testimony of Tiffany Boykin***

Boykin was a friend and classmate of Bethea's (ECF No. 20-24 at 26–27). On the night of the incident, she spoke to Bethea on the phone and he told her not to attend the party because a fight occurred. (*Id.* at 30–31). She met Bethea and his girlfriend later that evening. (*Id.* at 34–35). Bethea, with a scar on his face, told her that he got in a fight with someone he didn't know, and she described him as looking "upset." (*Id.* at 36–37).

***Testimony of Richard Pretsch***

Richard Pretsch, a detective with the Town of Newburgh Police Department, testified about his involvement with the case and his interactions with Bethea. (ECF No. 20-21 at 44–67; 20-22 at 6–16). Shortly after the incident at the party, Pretsch drove to Bethea's residence, where he was allowed inside by Bethea's girlfriend. (ECF No. 20-21 at 49–53). Once Bethea and Pretsch exited the home onto the sidewalk, Bethea told Pretsch that he was aware of what happened, had engaged in a fight recently, and was sorry about what happened. (*Id.* at 54). Bethea was placed in the back of a police vehicle, but he was not handcuffed. (*Id.* at 54–55).

While driving back to the police station, Bethea continued to speak to Pretsch and repeatedly apologized for what happened. (*Id.* at 55). Pretsch pulled the vehicle over to the side of the road, read Bethea his *Miranda* rights, and asked him several questions about waiving those rights, which Bethea responded to with an affirmative yes. (*Id.* at 55–59). When asked if he wished to talk to an attorney,

Bethea answered no (*Id.* at 59). He then agreed to continue speaking with Pretsch and explained his view of what happened. (*Id.*).

Bethea stated that after Gordon punched him and they started fighting in the house, he tried to follow Gordon through the front door, but it was blocked by partygoers. (*Id.* at 60). And when he grabbed a baseball bat from behind the front door, someone took it from him. (*Id.* at 60–61). He then exited through the back door, confronted Gordon in the driveway, and repeatedly punched Gordon in the face after Gordon attempted to punch him. (*Id.* at 60). Gordon fell to the ground where Bethea proceeded to kick him in the ribs and legs several times. (*Id.* at 60–61).

After Pretsch and Bethea arrived at the police station, Bethea was booked into the system with a height of six feet and a weight of 250 pounds. (ECF No. 20-22 at 13). Bethea was placed in an interview room where he was interrogated for approximately two or three hours by Pretsch and another detective. (ECF No. 20-21 at 62–63). The interview was recorded with audio and video. (*Id.* at 63). At one point during the discussion, Pretsch and the other detective left the room to have a discussion with a member of the District Attorney's Office after Bethea "made reference to an attorney," because they were unsure if the reference constituted an invocation of his right to counsel under the Fifth Amendment. (ECF No. 20-22 at 9, 14–15). It was determined that Bethea did not invoke his rights, and the interrogation continued. (*Id.* at 9–10, 14–15).

***Recording of Bethea's Interrogation***

During Prestch's testimony, the State introduced recordings of Bethea's interrogation, (ECF No. 20-21 at 64), which were played for the jury. (ECF No. 20-26 at 97–98). At the beginning of the interrogation, Bethea was informed of his *Miranda* rights and responded by stating that he would speak with police. (ECF No. 40-1 at 2). In describing what happened, Bethea explained that he was embarrassed after Gordon hit him and wanted to hit Gordon back. (*Id.* at 9–10). After the incident inside the house, he grabbed a bat, but somebody took it out of his hands. (*Id.* at 9–19). He left the house through the back door, walked around the side of the house to the front, and confronted Gordon. (*Id.*). Bethea punched Gordon and knocked him to the ground, where Bethea proceeded to kick him. (*Id.*). Bethea hit Gordon again after Gordon got back on his feet. (*Id.*). Bethea walked back to the house, told somebody to go get Gordon, and left. (*Id.* at 12–13). When pressed by detectives about the bat, Bethea reiterated that he wanted to hit Gordon with the bat, but somebody took it out of his hands before the fight. (*Id.* at 23–26).

After roughly an hour of questioning, the detectives told Bethea that Gordon was dead. (*Id.* at 29). While processing that new information, Bethea twice stated, "I think I need a lawyer," over the course of a few minutes. (*Id.* at 30). In response, one of the detectives stated they would get Bethea a lawyer if he wanted one. (*Id.*). But a lawyer was not provided. Over the course of the next hour, Bethea stressed that he was going to jail for murder and that he did not mean to kill Gordon. (*Id.* at 30–

40). At one point, Bethea asked, "What can I do to help myself . . . say I hit him with the bat?" (*Id.* at 34).

Police continued interrogating Bethea after leaving him alone in the interrogation room for a short period of time. (*Id.* at 39). When asked directly if he hit Gordon with a bat, Bethea responded, "Yes." (*Id.* at 47). And he later confirmed that he hit Gordon twice with the bat after grabbing it from inside the front door of the house. (*Id.* at 49–50). But despite those statements, Bethea also repeatedly stated that he only hit Gordon with his hands. (*Id.* 47–50). Just before the interrogation concluded, another detective entered the room and obtained a buccal swab of DNA evidence from Bethea. (*Id.* at 58).

***Testimony of David Otto***

David Otto, another detective with the Town of Newburgh Police Department, described his involvement with the investigation and the forensic evidence he gathered. When he investigated the Sylvester Court house, he collected a baseball bat located inside an umbrella stand behind the front door, which he identified as the bat placed into evidence. (ECF No. 20-25 at 21–23). Otto analyzed the bat for fingerprints but could not recover any latent ones. (*Id.* at 62–63). He then sent the bat to the New York State Police lab for DNA testing. (*Id.* at 23–24). When he investigated Bethea's sister's house, he noticed "reddish" stains on a set of exterior wooden stairs and collected swabs of the stains. (*Id.* at 38–39). He also removed several pairs of socks. (*Id.* at 41). While Bethea was being interrogated by Pretsch, Otto also collected a DNA buccal swab from Bethea. (*Id.* at 31). When

asked if Bethea consented to the swab collection, Otto answered that he was told by Pretsch that Bethea was submitting to it. (*Id.* at 32–33).[7]

***Testimony of Forensic Scientists***

Two forensic scientists with the New York State Police lab processed the evidence and samples collected by Otto. (ECF No. 20-26 at 18). The first scientist examined, among other things, the bat, Bethea's socks and sandals, and swabs from a set of stairs at Bethea's sister's house for traces of blood. (*Id.*). The tests of the bat, sandals, and stairs all returned negative results for blood, but one pair of socks returned a positive. (*Id.* at 24–35). The items were then preserved for DNA analysis and provided to a second scientist. (*Id.* at 26–43).

Based on the buccal swab collected by Otto, the second scientist was able to generate a DNA profile of Bethea. (*Id.* at 49–50). And he was able to generate a DNA profile of Gordon from blood collected from the deceased. (*Id.* at 51–52). In analyzing the handle of the bat, the second scientist retrieved a mixture of two DNA profiles, one of which matched Bethea's profile with a high degree of probability. (*Id.* at 55–56, 66–67). The analysis of the top of the bat revealed another mixture of two profiles, with one matching Gordon's profile with a similar degree of probability. (*Id.* at 60–62, 68). The analysis of the sandals and socks also revealed DNA profiles matching Bethea's profile, but the scientist stated that result was expected because those items belonged to him. (*Id.* at 73–76).

---

[7] But it is unclear if Otto obtained Bethea's consent directly, based on Otto's testimony. (ECF No. 20-25 at 32–33)

### 3. Bethea's Case-in-Chief

During his case-in-chief, Bethea testified on his own behalf and set forth his version of events. He arrived at the Sylvester Court house and noticed that "[e]verybody was drunk." (ECF No. 20-27 at 67). During the party, Gordon punched him twice in the face. (*Id.* at 72–73). Gordon left the house through the front door and Bethea attempted to follow him. (*Id.* at 75; ECF No. 20-28 at 9–10). As he made his way to the front door, he grabbed a bat, but he was stopped by other people at the party and had the bat taken from him. (ECF Nos. 20-27 at 75–77; 20-28 at 10–11). Bethea then exited through the back door to head to his vehicle. (ECF Nos. 20-27 at 76; 20-28 at 12–13). He confronted Gordon in front of the house and the two engaged in a fist fight. (ECF Nos. 20-27 at 77; 20-28 at 14–17).

Bethea knocked Gordon to the ground and proceeded to kick him. (ECF No. 20-27 at 77–78). After Gordon stood back up, Bethea punched him and knocked him to the ground again. (*Id.*). Bethea walked back to the house to grab his girlfriend and leave. (*Id.*). When he reentered the house, he told people at the party that Gordon was outside laying down on the ground. (*Id.* at 78–79).

Police arrived at his house the next morning, and he left with them to answer some questions. (*Id.* at 82–84). He confirmed that he asked for a lawyer during the interrogation and that the detectives acknowledged his request. (*Id.* at 84). But the detectives continued to question him, asking him about the bat. (*Id.* 84–85). Bethea, trying to help himself out, told the detectives that he hit Gordon with the bat because it was "what they wanted to hear." (*Id.* at 86). On direct examination,

Bethea was adamant that he never hit Gordon with a bat and never even went outside with one. (*Id.*). And when questioned about the recording played earlier in the trial, he confirmed the essence of the recording. (ECF No. 20-28 at 29–34).

**4. Summations**

***<u>Bethea's Summation</u>***

During his summation, Bethea's attorney articulated his theory of the case to the jury: there were two incidents on the night at issue, not one. (ECF No. 20-28 at 55, 58–59). The first incident was a fist fight between Bethea and Gordon. (*Id.*) The second incident, "the killing" with the bat, involved Gordon and an unknown man who was larger than Bethea. (*Id.*). He explained that the Tate's testimony supported the theory that a man larger than Bethea killed Gordon with the bat and then was seen getting into a black or dark car with some friends and leaving the scene. (*Id.* at 55). Although the attorney conceded that Bethea's DNA was on the bat, he pointed out that Bethea himself testified that he handled the bat (*id.* at 56), and asked the jury to consider carefully the statements Bethea made on the recording. (*Id.* at 56–57). He called on them to conclude that Bethea properly invoked his right to counsel while being interrogated by police, thereby revoking any waiver he provided previously. (*Id.*). Bethea's attorney concluded by emphasizing that the jury focus on Bethea's own testimony and the testimony of the Tates in finding Bethea was not guilty. (*Id.* at 58–59).

***Prosecutor's Summation***

The prosecutor set forth a different theory of the case, one focused on revenge. (*Id.* at 64–65). After the fight inside the Sylvester Court house, Bethea left through the back door, moved around the side of the house to the front porch, reached inside the front door to grab the bat, and proceeded to chase Gordon down the driveway before striking him with the bat. (*Id.* at 65–68). The prosecutor focused heavily on the testimony from Hinson and the Tates to support her description of what happened. (*Id.* at 68–75). She also focused on the DNA evidence on the bat. (*Id.* at 76–80).

After insinuating that somebody wiped down the bat to clean it up (*id.* at 78–79), she described Bethea's conduct during the interrogation as a "woe is me" act and stated that he had "plenty of time to concoct a story" about what happened before he was interrogated by police. (*Id.* at 82). And she denigrated Bethea for failing to pray for Gordon before completing her summation. (*Id.* at 83). She did not, however, mention that Bethea confessed to using a bat during his interrogation.

**C. Bethea's Section 330.30 Motion to Set Aside Verdict**

Shortly after his conviction, Bethea moved under section 330.30 of the New York Criminal Procedure Law to set aside the guilty verdict on the charge of first-degree manslaughter. (ECF No. 20-2 at 8-9). He argued that the verdict should be set aside because the evidence of his statements made to police during his interrogation should have been suppressed because he invoked his right to counsel,

which law enforcement ignored. (*Id.* at 10–23). The State opposed the motion (*id.* at 24–33), and Bethea replied. (*Id.* at 35–39).

By decision and order dated June 29, 2011, Bethea's motion was denied. (*Id.* at 41–44). The Court concluded that Bethea did not make an unequivocal invocation of his right to counsel because his statement of "I think I need a lawyer," by itself, was insufficient to serve as an invocation. (*Id.* at 42–43). And Bethea failed to make any additional statements that would have turned his initial statement into an unequivocal invocation; he failed to reiterate his request later, respond to Pretsch's question clarifying whether he wanted an attorney, or otherwise make a statement that demonstrated his initial statement was an affirmative request. (*Id.*). Thus, the court found that it was appropriate to admit Bethea's statements into evidence and for the Court to submit to the jury the question of whether Bethea invoked his right to counsel. (*Id.* at 43).

**D. Sentencing Proceeding**

Bethea was sentenced to serve a determinate term of imprisonment of 25 years for the first-degree manslaughter conviction and an indeterminate term of $2\frac{1}{3}$ to 7 years for the third-degree criminal possession conviction, with the terms to run concurrently. (ECF No. 20-30 at 17–18).

**E. Direct Appeal**

On direct appeal to the Appellate Division, Bethea initially asserted six claims in arguing for his conviction to be reversed: (1) the trial court erred when it denied his request to suppress his statements after he allegedly invoked his right to

counsel (ECF No. 20-3 at 42–69), (2) the trial court erred when it failed to suppress the DNA buccal swab and other physical evidence (*id.* at 70–75), (3) the trial court improperly charged the jury about his purported invocation of his right to counsel (*id.* at 76–82), (4) he was denied a fair trial based on improper remarks by the prosecutor during summation (*id.* at 82–90), (5) he received ineffective assistance of counsel (*id.* at 90–95), and (6) his sentence was excessive and harsh (*id.* at 96–107).

After the Government submitted their opposition (ECF No. 20-4 at 2–71), Bethea moved for leave to file a supplemental brief and his motion was granted. (*Id.* at 72). In his supplemental brief, Bethea asserted several additional claims not raised in his initial brief: (1) the voir dire process for the jury selected was improper (ECF No. 20-5 at 28–33), (2) the trial court failed to sufficiently question a juror before they were seated (*id.* at 33–38), and (3) the trial court erred in allowing testimony from a witness that Bethea had insufficient notice of under section 710.30 of the New York Criminal Procedure Law (*id.* at 39–52).

In March 2018, the Appellate Division affirmed Bethea's conviction in a split decision, with only the presiding justice dissenting. *People v. Bethea*, 71 N.Y.S.3d 589, 593–94 (N.Y. App. Div. 2018). In providing its rationale, the majority stated that Bethea's sentence was not excessive and that he received effective assistance of counsel. *Id.* at 593. Regarding Bethea's suppression claims, it concluded that he "made an intelligent, knowing, and voluntary waiver of his *Miranda* rights, and that his statement to the police was not the product of coercion." *Id.* at 591–92 (internal citation omitted). But it also concluded that he did eventually invoke his

right to counsel, and the trial court erred in failing to suppress the portion of his statement obtained after that invocation and the physical evidence from the DNA buccal swab. *Id.* at 592. Yet the trial court's error was deemed harmless because there was "no reasonable possibility that the error contributed to the conviction," as there was "overwhelming" evidence of guilt aside from the buccal swab and portion of his statement. *Id.*

The Appellate Division concluded that Bethea's section 710.30 claim was not reviewable on direct appeal because it was based on information outside the record, and his remaining claims regarding the jury charge, voir dire, jury selection process, and prosecutorial misconduct were all unpreserved for appellate review because he neither requested curative instructions nor moved for a mistrial on those grounds. *Id.* at 592–94 (citing *People v. Bell*, 26 N.Y.S.3d 88, 91 (N.Y. App. Div. 2016)). But it did offer passing statements on some of those unpreserved claims. It stated that any error associated with the trial court's decision not to charge the jury regarding his invocation of his right to counsel was harmless error. *Id.* at 592. The trial court was also within its discretion when it allowed the purportedly improper questions to prospective jurors, and it was not required to question a prospective juror because none of their conduct indicated that they were potentially unqualified to serve. *Id.* at 593. Some of the prosecutor's remarks during the trial were inappropriate, "inflammatory," and "denigrated" Bethea's defense, but any error on the trial court's part in allowing them to be made was harmless because "there was overwhelming

evidence of guilt." *Id.* at 593. And any improper summation remarks "were not egregious or pervasive enough" to deprive Bethea of a fair trial. *Id.*

The dissenting justice concluded that the trial court's failure to suppress the post-invocation statements and buccal swab was not harmless error because there was a possibility that the inclusion of that evidence may have contributed to the jury's verdict. *Id.* at 594–95. He referred to it as "arguably the most damaging evidence that was presented to the jury." *Id.* And he raised doubts about other aspects of the trial, highlighting that the jury was initially deadlocked and that the only witness who saw Bethea hit Gordon with the bat had consumed a substantial amount of alcohol before and during the party. *Id.*

Bethea sought leave to appeal to the New York Court of Appeals (ECF No. 20–5 at 92–93), which was denied on June 18, 2018. *People v. Bethea*, 106 N.E.3d 757 (N.Y. 2018).

**F. Bethea's Section 440.10 Motion to Vacate a Judgment**

After being denied leave to appeal, Bethea moved under section 440.10 of the New York Criminal Procedure Law to vacate the judgment against him. (ECF No. 20-6 at 30–31). In his motion papers, he reiterated, among other things, that he was denied a fair trial because Hinson was allowed to testify and the State violated the notice requirements of section 710.30. (*Id.* at 32–76). As occurred with his section 330.30 motion, the State opposed the section 440.10 motion (ECF No. 20-8 at 2–16), and Bethea replied. (ECF No. 20-10 at 4–20).

By decision and order dated October 31, 2018, the motion was denied. (ECF No. 20-12 at 2–6). The Court noted that Bethea failed to discover any new facts outside the record that could support vacating the judgment against him. (*Id.* at 4–5). Thus, it viewed his motion as a request for it "to correct a perceived error made by the Appellate Division," which it could not do under the statute. (*Id.* at 4). Bethea sought leave to appeal the October 31st order to the Appellate Division (*id.* at 7–19), which the State opposed (*id.* at 25–35), but his request was denied. (*Id.* at 41).

### G. Bethea's Section 2254 Petition

On June 11, 2019, Bethea timely filed his § 2254 petition.[8] (ECF No. 2). He asserts three claims: (1) the trial court erred by allowing Hinson to testify and identify Bethea in court; (2) he received ineffective assistance of counsel at trial; and (3) the trial court erred when it admitted the DNA evidence and statements Bethea made after allegedly invoking his right to counsel. (ECF Nos. 2 at 11–13; 3 at 16–55). Respondent opposes the petition, arguing that all of Bethea's claims are meritless. (ECF No. 19 at 20–39). In reply, Bethea reiterated the three arguments

[8] Under 28 U.S.C. § 2244(d)(1), a § 2254 petition generally must be filed within one year from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." Here, the New York Court of Appeals denied leave to appeal on June 18, 2018. *See People v. Bethea*, 31 N.E.3d 757 (N.Y. 2018). Because Bethea did not seek a writ of certiorari from the U.S. Supreme Court, Bethea's conviction became final 90 days later, on September 16, 2018. *See Williams v. Artuz*, 237 F.3d 147, 148–49 (2d Cir. 2001) ("[A] state prisoner's conviction becomes final for purposes of the one-year limitations period . . . when a writ of certiorari has been denied by the United States Supreme Court or the time for seeking such a writ has expired."); U.S. Sup. Ct. R. 13.1 (providing 90 days to file a petition for a writ of certiorari). Thus, Bethea's § 2254 petition, filed on June 11, 2019, was filed before the limitations period expired.

he made in his initial habeas petition and his supporting papers. (ECF No. 24 at 15–41).

## III. STANDARD FOR HABEAS REVIEW

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97 (2011). A state prisoner seeking habeas relief under § 2254 must show by a preponderance of the evidence that he or she is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997).

"Before a federal district court may review the merits of a state criminal judgment in a habeas corpus action, the court must first determine whether the petitioner has complied with the procedural requirements set forth in 28 U.S.C. §§ 2244 and 2254." *Hewitt v. Annucci*, No. 13 Civ. 7505 (NSR) (JCM), 2017 WL 10900091, at *6 (S.D.N.Y. May 3, 2017) (citation omitted). If a petitioner meets these threshold requirements, including timeliness and exhaustion of state court remedies, a federal court may decide a claim on the merits.

### A. Timeliness

AEDPA imposes a one-year statute of limitations on habeas petitions. As relevant here, a state prisoner has one year to file his petition after "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1). A judgment

becomes final "upon the completion of direct appellate review in state court and by the United States Supreme Court—either when certiorari proceedings are completed or when the time for seeking direct review by the United States Supreme Court expires, *i.e.*, ninety (90) days after the last decision by the highest state court to which a direct appeal can be taken." *Wynerman v. Colvin*, No. 16 Civ. 2886 (RA) (HBP), 2017 WL 3503402, at *2 (S.D.N.Y. June 13, 2017) (citing, among others, *Clay v. United States*, 537 U.S. 522, 532 (2003)).

The limitations period is tolled while "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2). The limitations period may also be equitably tolled if a petitioner can show that "extraordinary circumstances prevented him from filing his petition on time," and the petitioner "acted with reasonable diligence throughout the period he seeks to toll." *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000).

**B. Exhaustion**

Even if a petition for a writ of habeas corpus is timely filed, a federal court may not consider it unless the petitioner has exhausted all available remedies in the state courts. 28 U.S.C. § 2254(b)(1)(A); *see also Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) ("To provide the state with the first opportunity to consider and correct alleged violations of its prisoners' constitutional rights, a state prisoner is required to exhaust all of his available state remedies before a federal court can consider his habeas application."). In other words, the petitioner "must give the

state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In New York, a petitioner invokes "one complete round" of review by appealing an issue to the Appellate Division, then seeking leave to appeal to the New York Court of Appeals. *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005).

To satisfy the exhaustion requirement, a petitioner must "fairly present" each of his habeas claims in "each appropriate state court (including a state supreme court with powers of discretionary review)," in a manner that "alert[s] that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal quotation marks and citations omitted); *Conway*, 763 F.3d at 133 ("While 'a state prisoner is not required to cite chapter and verse of the Constitution in order to satisfy this requirement,' he must tender his claim 'in terms that are likely to alert the state courts to the claim's federal nature.'" (quoting *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011))).

A petitioner can "fairly present" his claims in several ways, including by citing to the applicable provisions of the federal Constitution in his state-court briefs, *see Davis v. Strack*, 270 F.3d 111, 122 (2d Cir. 2001), or by citing "pertinent federal cases employing constitutional analysis," *Rustici v. Phillips*, 308 F. App'x 467, 469 (2d Cir. 2009) (summary order) (internal quotation marks and citation omitted). But a claim is generally not "fairly presented" to a state court "if that court must read beyond a petition or a brief (or a similar document) that does not

alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin*, 541 U.S. at 32. The federal claim also must be presented with some specificity: "a general appeal to a constitutional guarantee as broad as due process" is insufficient "to present the 'substance' of such a claim to a state court." *Gray v. Netherland*, 518 U.S. 152, 163 (1996) (citing *Anderson v. Harless*, 459 U.S. 4, 7 (1982)).

**C. Procedural Default**

If a habeas petition presents unexhausted claims, a federal court must determine whether the petitioner would be able to return to state court to exhaust them. *Conway*, 763 F.3d at 133. An unexhausted claim for which the petitioner cannot obtain further review in state court is procedurally defaulted and must be dismissed. *Id.* ("[I]f the state prisoner fails to exhaust his state remedies in a manner in which, were he to return to the state courts with his unexhausted claim, those courts would find the claim barred by the application of a state procedural rule, we must deem the claim procedurally defaulted." (internal quotation marks and citations omitted)).

Separately, even where a timely and exhausted habeas claim is raised, the interests of finality, comity, and federalism demand that a federal court abstain from review when the last-reasoned state court opinion to address the claim relied upon an "adequate and independent finding of procedural default" to deny it. *Harris v. Reed*, 489 U.S. 255, 262, 264 (1989); *Levine v. Comm'r of Corr. Servs.*, 44 F.3d 121, 126 (2d Cir. 1995). A state court decision is "independent" when it "fairly

appears" to rest primarily on state law. *Jimenez v. Walker*, 458 F.3d 130, 138 (2d Cir. 2006) (citing *Coleman v. Thompson*, 501 U.S. 722, 740 (1991)). A decision is "adequate" if it is based on a rule that is "'firmly established and regularly followed' by the state in question." *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (quoting *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991)).

The exception to the procedural default rule is if the petitioner establishes either "cause and actual prejudice or that he is actually innocent." *Bousley v. United States*, 523 U.S. 614, 615 (1998) (internal quotation marks and citations omitted); *see also Coleman*, 501 U.S. at 748. A petitioner can show "cause" for a procedural default through examples of external factors, including when (1) "the factual or legal basis for a claim was not reasonably available," (2) "some interference by state officials made compliance [with the procedural rule] impracticable," or (3) "the procedural default is the result of ineffective assistance of counsel." *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994) (internal quotation marks and citation omitted). Although the Supreme Court has not given "precise content" to the term "prejudice," *see Wainwright v. Sykes*, 433 U.S. 72, 91 (1977), the prejudice must be sufficient "to overcome society's justified interests in the finality of criminal judgments," *United States v. Frady*, 456 U.S. 152, 175 (1982). "The petitioner's burden in making a gateway showing of actual innocence is deliberately 'demanding.'" *Hyman v. Brown*, 927 F.3d 639, 656 (2d Cir. 2019) (quoting *House v. Bell*, 547 U.S. 518, 538 (2006)). The standard of innocence in this context

"references 'factual innocence, not mere legal insufficiency.'" *Id.* at 657 (citing *Bousley*, 523 U.S. at 623).

**D. Merits Review**

If a claim meets all procedural requirements, AEDPA "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Jones v. Murphy*, 694 F.3d 225, 234 (2d Cir. 2012) (quoting *Hardy v. Cross*, 565 U.S. 65, 66 (2011)). Thus, even if a claim is timely and properly exhausted, under AEDPA, a federal court may only grant a habeas petition decided on the merits in state court if the challenged state-court decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time of the state-court decision, or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

Under the first prong of § 2254(d), a state court decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" the Supreme Court's result. *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000). "[C]learly established" federal law means "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions." *Id.* at 412.

A state court makes "an unreasonable application" of clearly established federal law if it "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *accord Cullen v. Pinholster*, 563 U.S. 170, 188 (2011); *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). That application of federal law must be "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)). "The state court decision must be 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement.'" *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (quoting *White v. Woodall*, 572 U.S. 415, 420 (2014)).

Under the second prong of § 2254(d), the factual findings of state courts are presumed to be correct. *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997). The petitioner must rebut this presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

**E. Liberal Construction of Pro Se Filings**

Courts liberally construe pleadings prepared by *pro se* litigants and hold them "to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam). Courts have a "duty to read *pro se* submissions to raise the strongest arguments they suggest." *Lewis v. Rawson*, 564 F.3d 569, 575 n.7 (2d Cir. 2009) (internal quotation marks and citation omitted).

## IV. DISCUSSION

As noted above, Bethea asserts three claims in his § 2254 petition: (1) the trial court erred by allowing Hinson to testify and identify Bethea in court; (2) he received ineffective assistance of counsel at trial; and (3) the trial court erred when it admitted the DNA evidence and statements Bethea made after allegedly invoking his right to counsel. (ECF Nos. 2 at 11–13; 3 at 16–55). The Court addresses each of these arguments in turn.

### A. Bethea's Claim Regarding Hinson's Testimony is Either Not Cognizable on Habeas Review or Fails on the Merits.[9]

Bethea argues that he was denied a fair trial because Hinson was allowed to testify at trial and make an in-court identification of Bethea, despite Bethea being unaware that Hinson would testify as an eyewitness. (ECF No. 3 at 39–53). His argument involves a purported violation of section 710.30 of the New York Criminal Procedure Law and a due process violation from an allegedly unduly suggestive pretrial identification procedure. The Court addresses each of those components in turn.

#### 1. Bethea's Section 710.30 Argument is Not Cognizable on Habeas Review.

Bethea argues that Hinson's in-court identification should have been excluded because Bethea was never given notice under section 710.30 that the State intended to call Hinson to testify. (*Id.* at 45–48).[10] Respondent argues in opposition

---

[9] It is undisputed that Bethea exhausted his claims regarding Hinson's testimony; the parties only dispute the merits of these claims.

[10] Bethea reiterated these section 710.30 arguments in his reply papers. (ECF No. 24 at 41).

that Bethea's section 710.30 claim is procedurally defaulted because he failed to adduce sufficient facts at trial for the trial court to rule on his claim and the Appellate Division properly followed an established principle when it decided not to rule on it. (ECF No. 19 at 35–36).

As a threshold issue, Bethea's argument fails because a violation of section 710.30 of the New York Criminal Procedure Law and its requirement to provide notice of testimony involving in-court identifications cannot serve as the grounds for a habeas claim. *See Sepulveda v. New York*, No. 08-CV-5284 (KMK), 2013 WL 1248379, at *2 (S.D.N.Y. Mar. 26, 2013) (holding it is "well settled" principle that alleged error regarding section 710.30 "is not cognizable on a habeas review" (internal quotation marks and citation omitted)). This is because any section 710.30 violation does not amount to a constitutional violation. Rather, it is "purely a creation of state statutory law," *Matthews v. Artuz*, No. 97 Civ. 3334(DC), 1999 WL 349694, at *8 (S.D.N.Y. May 27, 1999), and there is no federal constitutional right to this type of notice. *See Dotson v. Ercole*, No. 06 Civ. 7823(BSJ)(DFE), 2009 WL 1615997, at *2 (S.D.N.Y. June 9, 2009) ("The Constitution does not guarantee a right to advance notice of identification testimony."); *Arocho v. Walker*, No. 01 Civ. 1367(NRB), 2001 WL 856608, at *3 (S.D.N.Y. July 27, 2001) ("Violation of the notice requirement of [section 710.30] is purely a matter of state law and raises no constitutional issues for a habeas court to review."). Thus, Bethea's section 710.30 claim cannot be considered by this Court.

**2. Bethea's Due Process Argument is Without Merit.**

Bethea also argues that the prosecutor's notice violation amounts to a due process violation, in part because Hinson's identification of Bethea was the result of an impermissibly suggestive identification procedure, in which Hinson was shown only a single photograph. (ECF No. 3 at 39–45,49–51.)[11] Bethea also argues that the prosecution failed to demonstrate that Hinson knew Bethea well enough to serve as an eyewitness and identify him. (*Id.* at 48–51). Respondent argues in opposition that Bethea's due process claim lacks merit because the identification evidence was not impermissibly suggestive and any potential error caused by the trial court allowing the evidence into the record was harmless error. (*Id.* at 36–39).

Encompassed within the right to due process is the right to not be the object of unduly suggestive police identification procedures like photo arrays or lineups, because of the substantial risk that these procedures will lead to a misidentification. *See Galloway v. County of Nassau*, 141 F.4th 417, 424 (2d Cir. 2025). Whether an identification procedure is unduly suggestive is a holistic analysis, accounting for all aspects of the procedure collectively. *Id.* If an unduly suggestive procedure was used, the identification testimony must be excluded unless it can be deemed independently reliable through some other means. *United States v. Diaz*, 986 F.3d 202, 207 (2d Cir. 2021).

Here, the exact details of the identification procedure used by police with Hinson are neither well-known nor confirmed. The Appellate Division failed to

[11] Bethea also reiterated these due process arguments in his reply papers. (ECF No. 24 at 35–41).

discuss or describe the procedure, and a review of the record reveals almost no information. The only details this Court could discern were that Hinson testified that he spoke to police two days after the incident (ECF No. 20-22 at 60) and that the police allegedly showed him a single photograph of Bethea (ECF Nos. 2 at 13; 19 at 35; 20-5 at 40–41; 24 at 36).

Using a single photo (as opposed to an array) during an identification procedure "has been widely condemned" as unduly suggestive. *Diaz*, 986 F.3d at 207 (internal quotation marks and citations omitted) (concluding procedure where witness shown one photo of defendant was unduly suggestive); *see United States v. Caille*, No. 23-7651, 2025 WL 1450806, at *3 (2d Cir. May 21, 2025) (summary order) (similar). Thus, assuming Bethea's allegations are true and the identification procedure conducted with Hinson involved a singular photograph, the procedure may have been unduly suggestive. *See Diaz*, 986 F.3d at 297; *Caille*, 2025 WL 1450806, at *3.

But Hinson's in-court identification was independently reliable, so the trial court did not err in admitting it into evidence. In analyzing reliability, courts are generally guided by five factors, none of which is dispositive. *Diaz*, 986 F.3d at 207. Those factors are: (1) the witnesses' ability to see the crime as it happened; (2) to what degree the witness was paying attention; (3) the accuracy of any prior descriptions provided by the witness; (4) how certain the witness appeared during the identification procedure; and (5) the amount of time that elapsed between the occurrence of the crime and the identification procedure. *See Neil v. Biggers*, 409

U.S. 188, 199–200 (1972); *see also Diaz*, 986 F.3d at 207 (citing *Neil*, 409 U.S. at 199–200). Hinson testified that he saw Bethea around town at the store, had spoken to him previously, knew Bethea's nickname, and spoke with police two days after the incident. That amount of information is sufficient to show that Hinson's identification was reliable independent of the identification procedure. *See Caille*, 2025 WL 1450806, at *3 (holding trial court properly exercised discretion in admitting in-court identification because it was independently reliable given witness knew defendant for roughly one year and spent time with defendant on day before single-photo identification occurred); *United States v. Scott*, 21 Cr. 429 (AT), 2021 WL 4125212, at *2 (S.D.N.Y. Sept. 9, 2021) (finding identification independently reliable, despite unduly suggestive single photo procedure, because witnesses were defendant's neighbors, "saw him daily," knew defendant's nickname, and identification occurred shortly after incident occurred).

Thus, Bethea fails to demonstrate that the trial court's decision to admit Hinson's identification evidence was contrary to federal law or an unreasonable application of it. *See Burgess v. Conway*, No. 09 Civ. 9151(BSJ)(THK), 2010 WL 6841526, at *12–13 (S.D.N.Y. Oct. 21, 2010) (recommending denial of habeas petitioner's due process claim after concluding state court did not unreasonably apply federal law regarding identification procedures), *report and recommendation adopted by* 2011 WL 2638141 (S.D.N.Y. July 5, 2011).

### B. Bethea's Ineffective Assistance of Counsel Claim Fails on the Merits[12]

Between his initial petition and his accompanying memorandum of law, Bethea argues that he received ineffective assistance of counsel for four reasons: (1) his attorney failed to challenge the introduction of DNA evidence and statements he made to the police after invoking his right to counsel; (2) his attorney failed to argue for the inclusion of a jury charge on second degree manslaughter; (3) his attorney failed to challenge Hinson's testimony identifying Bethea in court; and (4) his attorney failed to challenge "the prosecutor's highly inflammatory and improper remarks during summation." (ECF No. 2 at 12–13; 3 at 38–39).[13] Respondent argues in opposition that Bethea fails to demonstrate that the Appellate Division's decision was contrary to, or an unreasonable application of, Supreme Court precedent from *Strickland v. Washington*, 466 U.S. 668 (1984). (ECF No. 19 at 29–30).

---

[12] It is undisputed that Bethea exhausted his claim of ineffective assistance of counsel (IAC); the parties only dispute the merits.

[13] In his reply papers, Bethea identifies additional instances that he argues constituted ineffective assistance of counsel. (ECF No. 24 at 22–34). He points to, among other things, his attorney's alleged failure to (1) challenge Pretsch's purportedly contradictory statements, (2) challenge statements made to the jury by the prosecutor during jury selection, and (3) seek a mistrial during the middle of the trial. (*Id.* at 27–34). But Bethea raised those arguments for the first time in his reply papers. Such arguments are not properly before this Court and will not be considered. *See United States v. Williams*, 12-cr-0626 (ER), 2025 WL 1183017, at *5 (S.D.N.Y. Apr. 23, 2025) (declining to rule on IAC claim in habeas petition because "[a]rguments that are first raised in a reply are not properly before the Court"); *Knowles v. United States*, No. 18-CV-1950 (KMK) and No. 11-CR-630 (KMK), 2022 WL 999078, at *6 n.9 (S.D.N.Y. Mar. 30, 2022) (declining to rule on additional IAC claim because "longstanding Second Circuit precedent instructs courts not to consider an argument raised for the first time in a reply brief, and this rule is consistently applied in the habeas context" (citation modified)).

To establish ineffective assistance of trial counsel, Bethea must satisfy a two-step test to demonstrate, first, that his attorney's performance was objectively deficient and, second, that he was actually prejudiced by that deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Englert v. Lowerre*, 115 F.4th 69, 73 (2d Cir. 2024) ("In *Strickland*, the Supreme Court clearly established that a defendant raising an ineffective-assistance-of-counsel challenge to conviction must show both that (1) counsel's performance was objectively deficient, and that (2) petitioner was actually prejudiced as a result." (internal quotation marks and citations omitted)), *cert. denied*, 145 S. Ct. 2826 (2025) (mem.). An attorney's performance is deficient when it falls below what was objectively reasonable when considering all of the circumstances at the time the alleged error occurred; and there is a strong presumption that an attorney's actions were within the range of reasonable conduct. *See Raysor v. United States*, 647 F.3d 491, 495 (2d Cir. 2011). In making this deficiency determination,"[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

To satisfy the second step of demonstrating sufficient prejudice, a petitioner must show that there is a reasonable probability that the result of the trial would have been different if the attorney's deficient performance did not occur. *See Strickland*, 466 U.S. at 694 (stating person asserting IAC claim "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different"). That probability is sufficiently reasonable when it "undermine[s] confidence in the outcome." *Id.* at 694–95 ("[T]he question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.").

Because the Appellate Division's written decision represents "the last-reasoned state court decision to address" Bethea's IAC claim, that claim is reviewed under the highly deferential AEDPA standard mentioned above in Section III.D.[14] *McBride v. Perez*, No. 13 Civ. 4792(VB)(PED), 2015 WL 5245072, at *9 (S.D.N.Y. June 25, 2015) (reviewing Appellate Division's decision on habeas petitioner's due process claim under AEDPA standard because it was the "last-reasoned state court to address" petitioner's claim), *report and recommendation adopted by* 2015 WL 5231509 (S.D.N.Y. Sept. 8, 2015). Under this highly deferential standard, a federal court may only grant a habeas petition decided on the merits in state court if the challenged state-court decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time of the state-court decision, or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the

[14] The portion of the Appellate Division's decision concluding that Bethea received effective assistance of counsel is succinct, consisting of just a single sentence. *See Bethea*, 71 N.Y.S.3d at 593 ("Contrary to the defendant's contentions, raised in his main brief and his pro se supplemental brief, a review of the record shows that the defendant was afforded the effective assistance of counsel."). This lack of explicit discussion makes it difficult to discern the Appellate Division's rationale in reaching its determination. Thus, the Court will turn "directly to the facts of the case to determine whether *Strickland* was applied unreasonably." *Carrino v. Eckert*, 21 CV 5909 (VB), 2023 WL 4296182, at *4 (S.D.N.Y. June 30, 2023) (reviewing facts of underlying case directly to rule on IAC claim in habeas petition "[b]ecause the Appellate Division did not explain why it was denying this claim beyond a brief statement that the argument was without merit").

State court proceeding." 28 U.S.C. § 2254(d)(1)–(2). To be clear, it is "difficult" to establish that a state court's application of *Strickland* was unreasonable under § 2254(d); *Strickland* and the statute each impose highly deferential standards, and applying them "in tandem" essentially doubles the heightened deference that must be given to the state court. *Harrington*, 562 U.S. at 105; *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (finding habeas petitioner's IAC claim failed "[u]nder the double deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard"), *reh'g denied*, 556 U.S. 1234 (2009). Applying these heightened standards, Bethea's IAC claim fails on the merits.

**1. Suppressing DNA evidence and Bethea's confession**

Bethea argues that he received ineffective assistance of counsel because his attorney failed to challenge the introduction of DNA evidence and his confession to the police after invoking his right to counsel. (ECF Nos. 2 at 12; 3 at 37–39). Respondent argues in opposition that Bethea received effective assistance because his attorney attacked those pieces of evidence in multiple ways. (ECF No. 19 at 30–31). Respondent highlights, among other things, the pretrial omnibus motion where Bethea's attorney sought to suppress the confession and DNA evidence, the attorney's participation in the suppression hearing, and the cross-examinations he performed during trial. (*Id.*).

Bethea's argument is negated by the record. Before trial, Bethea's attorney submitted an omnibus motion that sought various forms of relief. Among them was suppression of Bethea's confession and the DNA evidence. (ECF No. 20-1 at 12–13,

30–37). And when the trial judge scheduled a hearing on the suppression issue, Bethea's attorney appeared, again argued that the confession and DNA evidence should be suppressed, and cross-examined the State's witnesses. (ECF No. 20-13 at 20–77; 20-14 at 1–79). During the trial, the attorney cross-examined the State's witnesses that testified about the confession and collection of Bethea's DNA buccal swab. (ECF No. 20-22 at 14–16). And Bethea's attorney implored the jury in his summation to conclude that Bethea invoked his right to counsel, which would have impacted whether the confession and DNA buccal swab were admitted into evidence. (ECF No. 20-28 at 56–57). Viewing the totality of the attorney's conduct, Bethea fails to demonstrate that the Appellate Division's determination was contrary to or an unreasonable application of *Strickland*. When a petitioner's IAC claim is premised on an attorney's purported failure to act, and the record establishes the act did in fact occur, the claim is meritless. *See Thomas v. Griffin*, 14 Civ. 3559 (KMK) (PED), 2019 WL 7756150, at *10 (S.D.N.Y. Dec. 30, 2019) (concluding habeas petitioner's IAC claim alleging attorney failed "to persuade the trial court to grant a mistrial" was "plainly without merit" because record established attorney did seek mistrial), *report and recommendation adopted by* 2020 WL 418546 (S.D.N.Y. Jan. 27, 2020).[15]

---

[15] Because Bethea fails to satisfy his burden to establish the first prong of the *Strickland* test, it is unnecessary to address the second prong—whether he was prejudiced. If a petitioner fails to satisfy either prong, their claim fails. *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even address both components of the inquiry if the defendant makes an insufficient showing on one."); *United States v. Brown*, 710 F. App'x 491, 492 (2d Cir. 2018) (summary order) ("A court need not address both prongs of the *Strickland* test; if either fails, the entire claim fails.").

2. **Suppressing in-court identification**

Bethea also argues that he received ineffective assistance of counsel because his attorney "fail[ed] to suppress the illegal in-court identification evidence" in the form of Hinson's testimony. (ECF No. 3 at 38–39). More specifically, the attorney failed to timely file a suppression motion, seek a *Wade* hearing, object to the testimony at trial, seek a curative jury instruction, or preserve the issue for appeal. (ECF No. 24 at 28–32). Respondent argues in opposition that Bethea's argument is meritless because Bethea was not prejudiced by any failure to object to such testimony, given the other overwhelming evidence of both Bethea's identity and his guilt. (*Id.* at 32–33).

To the extent Bethea argues that he received ineffective assistance because his attorney failed to file a suppression motion, that argument is belied by the record. As part of the pretrial omnibus motion, his attorney sought to preclude the State from introducing *any* identification evidence because it violated the notice requirements under New York law, but the motion was denied. (ECF No. 20-1 at 27–29). Because his attorney filed that motion, Bethea cannot satisfy the second prong of the *Strickland* test and demonstrate that he suffered prejudice. *See Campbell v. Morton*, 19-CV-2448 (JMA), 2023 WL 8263040, at *15 (E.D.N.Y. Nov. 28, 2023) (denying habeas petitioner's IAC claim alleging failure to object to identification notice, as petitioner "cannot show prejudice because, irrespective of the timeliness or propriety of the [section 710.30] notice, defense counsel still moved to suppress the identification evidence against [the petitioner]").

To the extent Bethea argues that his attorney should have sought to conduct a *Rodriguez* or *Wade* hearing in the middle of trial before Hinson testified, his argument also lacks merit. Under New York law, when the prosecution intends to use a witness to identify a defendant, a *Rodriguez* hearing is often held to determine the witness's level of familiarity with the defendant. *Mack v. Collado*, 21 Civ. 8541 (KMK)(PED), 2023 WL 6200871, at *9 (S.D.N.Y. Feb. 21, 2023), *report and recommendation adopted by* 2023 WL 6200170 (S.D.N.Y. Sept. 22, 2023). The hearing serves as a way for the prosecution to demonstrate that the witness is so familiar with the defendant that any identification procedure the police conducted with the witness simply confirmed the witness's identification, i.e., there are no concerns about any potential suggestiveness of the procedure influencing the identification. (*Id.*). If the prosecution fails to show sufficient familiarity, then the court holds a *Wade* hearing to determine whether the identification procedure used by police was "so improperly suggestive as to taint an in-court identification." *Lynn v. Bliden*, 443 F.3d 238, 248 (2d Cir. 2006) (internal quotation marks and citations omitted).

The decision by Bethea's attorney not to object to Hinson's testimony, or seek to reopen the suppression hearing by having a miniature *Rodriguez* or *Wade* hearing in the middle of trial, constitutes a "strategic choice" by the attorney. *Jamison v. Griffin*, 15 Civ. 6716(PKC)(AJP), 2016 WL 1698350, at *21 (S.D.N.Y. Apr. 27, 2016), *report and recommendation adopted by* 2016 WL 4030929 (S.D.N.Y. July 27, 2016). An attorney is not required to assert every possible nonfrivolous

argument. *See Lynch v. Dolce*, 789 F.3d 303, 311 (2d Cir. 2015) ("[C]ounsel has no duty to raise every non-frivolous issue that could be raised."); *Knowles*, 556 U.S. at 127 ("The law does not require counsel to raise every available nonfrivolous defense."). Moreover, an attorney is not required to advance an argument that they reasonably believed would fail. *See Leasure v. Keyser*, 21-CV-2598 (PKC), 2026 WL 538930, at *10 (E.D.N.Y. Feb. 26, 2026) ("An attorney's choice not to pursue an argument that he or she reasonably believed would fail is not objectively unreasonable."); *Premo v. Moore*, 562 U.S. 115, 124 (2011) (concluding counsel provided adequate representation, despite not seeking to suppress evidence, because motion "was likely to fail"); *Sexton v. Beaudreaux*, 585 U.S. 961, 965 (2018) (similar).

When Bethea's attorney became aware that the State intended to call Wimes and the Garners to provide identification evidence, he sought to preclude that evidence based on the State's failure to provide notice under section 710.30. (ECF Nos. 20-15 at 19–21; 20-20 at 46–47). Before jury selection, Bethea's attorney reiterated his request to the trial judge, arguing that the State violated the notice requirements of section 710.30. (ECF No. 20-15 at 19–20). The State opposed the request, arguing that it never provided notice because it was not required to do so. (*Id.* at 20). The Court denied Bethea's request and informed both sides that the witnesses should appear on the morning of their testimony to provide "a very short statement that they've known [Bethea] . . . for a substantial period of time" so he

could rule on whether the identification procedures were confirmatory.[16, 17] (*Id.* at 21). Bethea's attorney subsequently waived the section 710.30 requirements before Wimes and the Garners testified. (*Id.*).

By the time Hinson was called to testify at trial, Bethea's attorney had already raised the section 710.30 issue no less than three times. Each time he was unsuccessful. And it was reasonable for the attorney to believe that reasserting it with respect to Hinson was unlikely to result in a successful challenge. Thus, it was not unreasonable for Bethea's attorney to make the strategic choice not to object to Hinson's testimony or otherwise seek a *Rodriguez* or *Wade* hearing in the middle of a trial. *See McClary v. Conway*, No. 06-CV-2064 (ENV), 2010 WL 3928563, at *5 (E.D.N.Y. Oct. 4, 2010) (finding failure to pursue suppression motion not objectively unreasonable because it was unlikely to succeed); *Premo*, 562 U.S. at 124 (similar).

In any event, rather than seek to exclude the evidence from Hinson, he made the "tactical decision" to cross-examine him. (ECF No. 20-22 at 40–65). And he did so extensively, questioning Hinson about his parole, how much and what kind of alcohol he was drinking at the party, and what he saw that night at the Sylvester Court house. (*Id.*). He was able to have Hinson confirm key details about the incident, i.e., Bethea had nothing in his hands when he exited the back door, the front door never reopened after Gordon left, and Bethea never reentered the house.

---

[16] The Court, essentially, ordered a *Rodriguez* hearing.

[17] Bethea's attorney later lambasted the prosecutor for those section 710.30 failures in a conversation with the prosecutor and trial judge just before the Garners testified. (ECF No. 20-20 at 47–48).

(*Id.* at 62–63). All of those factual details supported Bethea's attorney's theory that Bethea was not the one who attacked Gordon. This strategic choice, "particularly under the doubly deferential AEDPA standard, . . . does not constitute ineffective assistance." *Jamison*, 2016 WL 1698350, at *21 (denying habeas petitioner's IAC claim premised on attorney's failure to move to reopen suppression hearing because attorney made strategic choice to use witness testimony to support defense theory).

Bethea also fails to demonstrate ineffective assistance because it was unlikely that a *Rodriguez* or *Wade* hearing would have led to a determination that Hinson's identification of Bethea was anything other than confirmatory. In other words, not only was it reasonable for Bethea's attorney to choose not to seek such a hearing, but Bethea also fails to demonstrate that he was actually prejudiced as a result. Hinson testified that he was familiar with Bethea because they lived in the same town, they had spoken to each other in person before, and Hinson often saw him around town. (ECF No. 20-22 at 20). Hinson even knew Bethea's nickname, "R-dot." (*Id.*). That amount of information is enough to establish that Hinson was sufficiently familiar with Bethea. *See People v. Heyliger*, 5 N.Y.S.3d 566, 569 (N.Y. App. Div. 2015) (holding witness sufficiently familiar with defendant because witness was acquainted with one of defendant's relatives, knew him for several years "from seeing him at different parties and clubs," and knew his nickname, despite never being "formally introduced" to defendant), *appeal denied*, 25 N.Y.3d 1165 (N.Y. 2015). Because of the likelihood that Hinson would be deemed sufficiently familiar, the decision by Bethea's attorney not to object to Hinson's

testimony or reopen the suppression hearing was not ineffective assistance. *See Steinhilber v. Kirkpatrick*, 18 Civ. 1251 (VB)(JCM), 2020 WL 9074808, at *27 (S.D.N.Y. Aug. 21, 2020) ("[B]ecause it is unlikely that a *Rodriguez* hearing would have demonstrated that the voice identifications were not confirmatory, it is axiomatic that trial counsel could not be deemed ineffective by not requesting such a hearing."), *report and recommendation adopted by* 2021 WL 1254554 (S.D.N.Y. Apr. 5, 2021).

Thus, Bethea fails to demonstrate that the Appellate Division's determination that he received effective assistance of counsel was contrary to, or an unreasonable application of, *Strickland*. *See id.* (holding that counsel was not ineffective for declining to request *Rodriguez* hearing); *Mack*, 2023 WL 6200871, at *10 (similar); *Hankins v. Smith*, No. 03 Civ. 5404(WHP)(KNF), 2008 WL 4601000, at *13 (S.D.N.Y. Oct. 15, 2008) (rejecting habeas petitioner's IAC claim because petitioner failed to show that the Appellate Division's conclusion that counsel was not ineffective for failing to request a *Wade* hearing was contrary to, or an unreasonable application of, *Strickland*).

**3. Jury charge**

Bethea also argues that his attorney should have pursued a jury charge for second degree manslaughter because it was a "more fitting" charge than first degree manslaughter based on his intoxication. (ECF No. 2 at 12). Respondent argues in opposition that Bethea's argument is meritless because it involves a strategic decision made by his attorney. (ECF No. 19 at 31–32). According to Respondent,

that strategic decision also had no chance of success based on the Appellate Division's ruling; thus, failing to pursue it was not an objectively unreasonable action for the attorney to take. (*Id.* at 32).

An attorney's decision to request that the trial judge instruct the jury on a lesser included offense constitutes a strategic trial decision, as it fits into the larger, overarching trial strategy involved in presenting a defense. *See Cassie v. Graham*, No. 06 Civ. 5536(PKC)(AJP), 2007 WL 506754, at *25 (S.D.N.Y. Jan. 31, 2007) (describing how decision not to seek jury instruction on lesser-included offense was part of trial counsel's overall defense strategy), *report and recommendation adopted by* 2009 WL 362134 (S.D.N.Y. Feb. 10, 2009). And courts throughout the Southern District have confirmed that relationship. *See Clark v. Capra*, 14 Civ. 2507 (VB)(LMS), 2017 WL 4685298, at *13 (S.D.N.Y. June 22, 2017) (explaining relationship between lack of lesser included offense request and trial counsel's "all or nothing" defense strategy to deny guilt entirely), *report and recommendation adopted by* 2017 WL 4685104 (S.D.N.Y. Oct. 17, 2017); *Samuels v. Bennett*, No. 03 Civ. 2340(BSJ)(FM), 2009 WL 2516850, at *24 (Aug. 17, 2009) (similar); *Mendez v. Connolly*, No. 05 Civ.1979(DC), 2006 WL 464045, at *9 (S.D.N.Y. Feb. 23, 2006) (similar).

Throughout the trial, Bethea's attorney pursued an "all-or-nothing" defense theory that Bethea was not the perpetrator. The clearest indication of this is seen in his summation, where he asserted that there were two incidents on the night Gordon died: Bethea and Gordon initially engaging in a fist fight, and Gordon being

killed later when he was attacked by a different person wielding the bat. (ECF No. 20-28 at 55, 57–59). And that description of the defense theory is supported by the trial judge's own view of the proceedings. (*Id.* at 44–48). This type of defense theory—denying all guilt—"is a strategy that practically precludes a request for an instruction on a lesser included offense." *Cassie*, 2007 WL 506754, at *25 (internal quotation marks and citations omitted). And an argument by Bethea's attorney to include the instruction, especially after the trial judge eliminated it previously, would have been contrary to that strategy. *Mendez*, 2006 WL 464045, at *9 (concluding attorney's decision not to seek lesser included charge did not constitute ineffective assistance because it contradicted his "all-or-nothing" strategy).

Asking to include the instruction would have "severely undermine[d]" his ultimate position that Bethea should not be found guilty of any of the crimes. *Domingo v. Greiner*, No. 99 Civ.1906(JSM), 2002 WL 362761, at *2 (S.D.N.Y. Mar. 5, 2002) (finding inclusion of lesser included trespass charge undermined attorney's argument that defendant was innocent); *Cruz v. Superintendent*, 13-CV-2414 (JMF), 2016 WL 2745848, at *9 (S.D.N.Y. May 11, 2016) (denying IAC claim after concluding attorney's decision to "go for broke" and not lesser included manslaughter charge was not unreasonable).

Allowing for an instruction on second degree manslaughter, while simultaneously arguing to the jury that Bethea was not guilty of first-degree manslaughter or any other crime, potentially sends a mixed message to the jury and suggests that the attorney is not completely sold on the merits of their argument.

*See Domingo*, 2002 WL 362761, at *2 ("[A]ny experienced attorney recognizes that the making of alternative arguments conveys to the jury the suggestion that the attorney does not believe that his principal argument has merit."); *Samuels*, 2009 WL 2516850, at *24 (explaining that decision to pursue lesser included offense would have "reduced the persuasiveness" of attorney's primary argument).

It also would have opened the door for a potential "compromise verdict" where the jury could settle on second-degree manslaughter rather than finding Bethea not guilty of any crimes. *Samuels*, 2009 WL 2516850, at *24 (concluding attorney's decision not to oppose elimination of manslaughter charge was not ineffective assistance because it "eliminated the risk of a compromise verdict in which a jury would settle for the manslaughter charge in order to end its deliberations.").

Thus, Bethea fails to demonstrate that the Appellate Division's determination that he received effective assistance of counsel was either contrary to, or an unreasonable application of, the Supreme Court precedent in *Strickland*. *See Cassie*, 2007 WL 506754, at *25 (denying habeas petitioner's IAC claim alleging trial counsel should have sought lesser included manslaughter charge because doing so went against overall defense strategy).

**4. Inflammatory remarks**

Bethea argues that his attorney should have objected to various improper remarks made by the prosecutor during their summation at the close of trial. (ECF No. 2 at 13). Respondent argues in opposition that Bethea's argument is meritless

because the comments did not prejudice him enough to infect the trial with unfairness, as shown by the Appellate Division using its interest-of-justice jurisdiction to address the claim in its decision. (*Id.* at 33).

Here, Bethea fails to demonstrate that the Appellate Division's determination that he received effective assistance of counsel was contrary to, or an unreasonable application of, Supreme Court precedent. A review of Bethea's papers reveals that his allegations are vague and conclusory. His initial petition contains a single sentence alleging that his counsel "neglected to challenge . . . the prosecutor's highly inflammatory and improper remarks during summation." (ECF No. 2 at 13). He fails to identify any particular remarks made and explain how those remarks caused him to suffer prejudice. And his memorandum of law fails to make any argument whatsoever regarding improper remarks; it focuses entirely on the alleged failure to suppress Hinson's testimony identifying Bethea. (ECF No. 3 at 37–39). Bethea does nothing to "identify counsel's asserted failings with any specificity or show how any different conduct might have changed the result," which is insufficient to sustain an IAC claim on habeas review. *Lamberti v. United States*, No. 95 CIV. 1557(PNL), 1998 WL 118172, at *2 (S.D.N.Y. Mar. 13, 1998) (denying habeas petition after concluding petitioner's IAC allegations were "vague and conclusory"); *see Angel v. Garvin*, No. 98 CIV 5384 LTS THK, 2001 WL 327150, at *8 (S.D.N.Y. Apr. 3, 2001) (similar).

Even assuming Bethea's arguments were not vague and conclusory, the decision to object to purportedly improper remarks during summation is "a strategic

choice, which is virtually unchallengeable." *Arreola v. United States*, 20-CV-1490 (RMB) and 15-CR-0824-01 (RMB), 2023 WL 3412756, at *6 (S.D.N.Y. May 12, 2023) (internal quotation marks and citations omitted). This tactical decision is left to the professional judgment of the attorney and cannot serve as the basis for an IAC claim "absent exceptional grounds." *Knowles v. United States*, No. 18-CV-1950 (KMK) and No. 11-CR-630 (KMK), 2022 WL 999078, at *9 (S.D.N.Y. Mar. 30, 2022) (internal quotation marks and citations omitted).

Bethea fails to articulate any exceptional grounds for this Court to consider. Thus, he fails to demonstrate that the Appellate Division's determination that he received effective assistance of counsel was contrary to *Strickland* or an unreasonable application of that Supreme Court precedent. *See Ventura v. United States*, 18-cv-9179 (JGK), 20-cv-8064 (JGK), and 09-cr-1015 (JGK), 2024 WL 1929183, at *13 (S.D.N.Y. May 1, 2024) (denying habeas petitioner's IAC claim because "a lack of defense objections during the [prosecutor's] summation does not mean that counsel's performance fell below an objective standard of reasonableness"); *Knowles*, 2022 WL 999078, at *9 (denying habeas petition after finding counsel's failure to "object to one short statement in a summation at the end of a multi-week trial" failed to satisfy first prong of *Strickland* standard for IAC claims).

### C. Bethea's Due Process Claim Fails on the Merits[18]

Bethea challenges the Appellate Division's determination that the erroneous admission of his confession and the resulting DNA evidence was harmless. (EFC No. 3 at 18–32). The Appellate Division held that Bethea's confession was obtained in violation of his right to counsel and that the trial court erred in admitting both the confession and the subsequently collected DNA evidence linking him to the murder weapon. *People v. Bethea*, 71 N.Y.S.3d 589, 592 (N.Y. App. Div. 2018). But it found those errors harmless in light of the overwhelming remaining evidence of guilt, concluding that there was "no reasonable possibility that the error contributed to the conviction." *Id.* Bethea argues that the remaining evidence was not overwhelming (ECF No. 3 at 29–37) and that the improperly admitted evidence was central to the prosecution's case. (*Id.* at 18–32).[19] Respondent counters that the Appellate Division's harmless-error determination warrants deference (ECF No. 19 at 20–21) and that the remaining evidence was sufficient to sustain the conviction. (*Id.* at 22–28).

On a collateral habeas review challenging a state court's application of the harmless error determination under *Chapman v. California*, 386 U.S. 18 (1967), a petitioner must make two separate showings to obtain relief. *See Brown v. Davenport*, 596 U.S. 118, 134 (2022) ("[A] federal court must *deny* relief to a state

---

[18] It is also undisputed that Bethea exhausted his claim that the trial court improperly allowed into evidence some of his statements to police and physical evidence from the DNA buccal swab; the parties only dispute the merits of this claim.

[19] Bethea reiterated his arguments in his reply papers. (ECF No. 24 at 15–21).

habeas petitioner who fails to satisfy either this Court's equitable precedents or AEDPA. But to *grant* relief, a court must find that the petitioner has cleared both tests."). First, under *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), the petitioner must show that the state court's error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Second, under AEDPA, the petitioner must show that the state court's application of Supreme Court precedent, in this case *Chapman*, was "unreasonable." *Brown*, 596 U.S. at 135 ("When a state court has applied *Chapman*, § 2254(d)(1) requires a habeas petitioner to prove that the state court's decision was unreasonable."); *see Krivoi v. Chappius*, 21-2934-pr, 2022 WL 17481816, at *3 (explaining that petitioner "must show that the state court's harmless error determination was an unreasonable application of federal law as determined by the Supreme Court (i.e., that the state court's harmless error determination was an unreasonable application of *Chapman*).").

To show that the harmless error determination was unreasonable, a petitioner must show that "no fairminded jurist could reach the state court's conclusion" under *Chapman*. *Brown*, 596 U.S. at 135 (citation modified). Put differently, the question is "whether every fairminded jurist would agree that . . . [the] error was prejudicial." *Id.* at 136. But if the petitioner fails to show substantial and injurious effect under *Brecht*, the Court need not reach the AEDPA test. *See id.* at 138–39 ("[I]f a federal court determines that a habeas petition fails because of

*Brecht*, there is no need to prolong the matter by formally applying AEDPA as well." (citation modified)).[20] The Court addresses both requirements.

### 1. *Brecht* test

Under *Brecht*, Bethea must show that the erroneous admission of his confession and DNA evidence had a substantial and injurious effect on the verdict. That standard is satisfied if the Court harbors "grave doubt" about the effect of the error. *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995). Grave doubt does not require "absolute certainty" that the error affected the outcome. *Brown*, 596 U.S. at 135–36. Rather, it arises when the Court is in virtual equipoise as to whether the error was harmless. *See O'Neal*, 513 U.S. at 435 ("By 'grave doubt' we mean that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.").

Where, as here, the purported error involves an erroneous admission of evidence, the principal consideration is "the overall strength of the prosecution's case." *Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000) (describing overall strength of case as "single most critical factor in determining whether error was harmless" (internal quotation marks and citations omitted)). The Court must also assess the importance of the improperly admitted evidence, including whether it bore on a

[20] The Supreme Court has never stated that a habeas court must first determine whether the petitioner satisfied the *Brecht* test before moving to the AEDPA test; it has only stated that a petitioner must satisfy both tests. *Brown*, 596 U.S. at 122. But the *Brecht* test inevitably acts as a first step in the analysis because it is easier to satisfy than the AEDPA test. *See Brecht*, 507 U.S. at 623 (describing the *Brecht* test as "less onerous" than the AEDPA test); *O'Neal v. McAninch*, 513 U.S. 432, 438–39 (describing *Brecht* test as "more lenient"); *Brown*, 596 U.S. at 136 ("[A] petitioner might be able to prevail under *Brecht* thanks to favorable circuit case law but still lose under AEDPA because no comparable holding exists in this Court's precedents.").

critical issue and was material to establishing a critical fact. *See id.* at 526. Other relevant considerations include the prosecutor's use of the evidence and whether properly admitted evidence corroborated it or made it cumulative. *Wood v. Ercole*, 644 F.3d 83, 94 (2d Cir. 2011).

Applying these considerations, the Court harbors grave doubt about the effect of the improperly admitted confession and DNA evidence on the verdict. Without that evidence, the prosecutor's case rested primarily on witness testimony that was inconsistent in several respects. The confession and, to a lesser extent, the DNA evidence also directly addressed a critical question for the jury—whether Bethea struck Gordon with the bat.

First, excluding the confession and DNA evidence substantially weakens the prosecution's case. The witnesses disagreed about whether Bethea held a bat when he returned to the house. Marquis Garner testified that he did. (ECF No. 20-21 at 19–20). But Clark and Marques Garner each testified that he did not. (ECF Nos. 20-19 at 5; 20-20 at 97–98). Their accounts of Bethea's statements also differed. Clark recalled that Bethea said something about Gordon being asleep (ECF No. 20-19 at 2–3), while both Garners recalled him saying something about hitting Gordon with a bat (ECF Nos. 20-20 at 97–98; 20-21 at 18–19). Hinson, meanwhile, testified on direct examination that Bethea did not have a bat when he walked past Hinson outside, but testified to the opposite on cross-examination. (ECF No. 20-22 at 36, 49).

The witnesses also differed in their accounts of the attack itself. Hinson testified that he followed a crowd outside and saw Bethea swing a bat toward the ground near Gordon. (ECF No. 20-22 at 32–34, 47). But Tiquon Tate, a nearby neighbor, testified that nobody was outside when the attack occurred. (ECF No. 20-23 at 56). And neither Tiquon nor his wife, Lisa, identified Bethea as the perpetrator, although both testified that they could see everything that happened during the altercation. (*Id.* at 40, 61).

The partygoers' alcohol and marijuana use also raised questions about the reliability of their observations. All admitted to drinking or smoking marijuana at the party. Wimes and Marquis Garner drank "a lot" (ECF Nos. 20-20 at 23; 20-21 at 12), Marques Garner smoked marijuana (EFC No. 20-20 at 89), and Hinson was "passed tipsy" after having seven drinks (ECF No. 20-20 at 25, 28, 31). Even Clark, arguably the least intoxicated of the partygoers, acknowledged having multiple drinks. (ECF No. 20-19 at 18). Their consumption bears on the reliability of their observations and recollections. *See Furlong v. Circle Line Statue of Liberty Ferry, Inc.*, 902 F.Supp. 65, 69 (S.D.N.Y. 1995) ("[D]rug use may be relevant to credibility, since it can affect memory and perception.").

Taken together, these inconsistencies and credibility concerns materially weaken the prosecution's case without Bethea's confession and DNA evidence. Unlike cases in which substantial independent evidence supported the verdict despite exclusion of improperly admitted evidence, the prosecution here depended chiefly on partially inconsistent witness accounts. *Contra Alfonso v. Lamanna*, 18

Civ. 4607 (KMK)(PED), 2022 WL 21758864, at *10 (S.D.N.Y. Apr. 6, 2022) (denying habeas petitioner's claim regarding harmless error determination because surveillance video evidence and witness testimony identifying petitioner as shooter retained strength of prosecution's case even with petitioner's statements removed), *report and recommendation adopted by* 2022 WL 14061783 (S.D.N.Y. Oct. 24, 2022); *Suero v. Noeth*, 1:19-cv-03752 (ER) (SDA), 2020 WL 3964424, at *11 (S.D.N.Y. June 19, 2020) (similar), *report and recommendation adopted by* 2020 WL 3962109 (July 13, 2020).

Second, the improperly admitted evidence was central to the prosecution's case. Both Bethea's confession and, to a lesser extent, the DNA evidence bore directly on whether Bethea struck Gordon with the bat. Only Bethea's DNA was found on the bat; his fingerprints were absent. Given the conflicting accounts of his handling of the bat, the DNA evidence provided physical corroboration that he handled it. In Bethea's confession, which the Appellate Division held was obtained in violation of his *Miranda* right to counsel, Bethea essentially admitted hitting Gordon with the bat and killing him. (ECF No. 40-1 at 46–50, 53). And the prosecutor heavily emphasized both the DNA evidence and Bethea's interrogation statements in her summation (ECF No. 20-28 at 76–80), underscoring their importance to the prosecution's case. *See Wood*, 644 F.3d at 96–99 (finding wrongly admitted evidence important, in part, because prosecutor "honed in on" it during trial); *Wray*, 202 F.3d at 526–30 (finding wrongly admitted evidence "crucial," in part, "in light of prosecutor's emphasis on [it]" at trial).

These considerations leave the Court in virtual equipoise about whether the jury would have convicted Bethea without the confession and DNA evidence. The divided Appellate Division reinforces that doubt. In dissent, Justice Hall called the confession and DNA evidence "arguably the most damaging evidence that was presented to the jury," and observed that the jury was initially deadlocked during deliberations. *People v. Bethea*, 71 N.Y.S.3d 589, 595 (N.Y. App. Div. 2018). She concluded that the confession and DNA evidence "might have contributed to the conviction." *Id.* This Court shares those concerns. Given the weaknesses in the remaining proof, the importance of the improperly admitted confession and DNA evidence, and the jury's initial deadlock, the Court harbors grave doubt about whether the admission of that evidence was harmless. Bethea has therefore satisfied *Brecht* by demonstrating a substantial and injurious effect on the jury's verdict. *See Wood*, 644 F.3d at 99 (concluding habeas petitioner satisfied *Brecht* test because habeas court had grave doubt about effect of trial's court error in admitting confession).

**2. AEDPA test**

Satisfying *Brecht* does not end the inquiry. Under AEDPA, the Court must defer to the Appellate Division's harmless-error determination unless its application of *Chapman* was objectively unreasonable. The inquiries are distinct. "*Brecht* asks only whether a federal habeas court itself harbors grave doubt about the petitioner's verdict," whereas "AEDPA asks whether *every* fairminded jurist would agree that an error was prejudicial." *Brown*, 596 U.S. at 136. AEDPA therefore imposes a

"demanding standard." *Diaz v. Miller*, 22-1835, 2023 WL 4363245, at *2 (2d Cir. July 6, 2023) (summary order). A federal court may not set aside a state court's harmless-error determination merely because it would have reached a different conclusion. Rather, the petitioner must show that no fairminded jurist could agree with the state court's application of *Chapman*. *Brown*, 596 U.S. at 136, 143–44. Thus, this Court's grave doubt about the verdict does not, by itself, establish that the Appellate Division's harmless-error determination was objectively unreasonable.

Here, although the Court harbors grave doubt about the effect of the improperly admitted evidence, not every fairminded jurist would have to agree that the error was prejudicial. Bethea himself testified that he grabbed the bat at the party (ECF Nos. 20-27 at 75–77; 20-28 at 10–11) and punched and kicked Gordon outside. (ECF No. 20-27 at 78). His admission that he handled the bat provides an independent explanation for the presence of his DNA on it, apart from the possibility that he used it to strike Gordon, which lessens its prejudicial impact. The confession presents a closer question. Unlike the DNA evidence, Bethea's confession directly implicated him in the fatal attack and may have led the jury to credit otherwise inconsistent eyewitness testimony. But the prosecution also presented independent evidence implicating Bethea. Both Marquis and Marques Garner testified that, upon returning to the house, Bethea admitted that he hit Gordon with the bat. Marquis also testified that Bethea returned to the house carrying a bat, which he dropped on the floor. (ECF Nos. 20-20 at 97–98; 20-21 at 20). Hinson

testified that he saw Bethea swing a bat three or four times "[t]owards the ground area" while Gordon lay on the ground. (ECF No. 20-22 at 32–34, 47). Clark, another party-goer, testified that she saw Bethea return to the house looking "[l]ike something happened" (ECF No. 20-19 at 4) and said, "Go get your boy. He's sleeping" or something similar. (*Id.*). And although Tiquon Tate did not identify Bethea, his description of the perpetrator generally matched Bethea's physical description, apart from arguably minor differences in height and weight. (ECF No. 20-23 at 51).

Fairminded jurists could credit this testimony despite some inconsistencies and reasonably conclude that the improperly admitted confession and DNA evidence were largely corroborative of other incriminating evidence, particularly Bethea's statements to the Garners and Hinson's account of the attack. To be sure, the confession's persuasive force, the prosecutor's emphasis on it, and the jury's initial deadlock provide substantial reasons for this Court to doubt its harmlessness. Yet AEDPA does not permit the Court to substitute the Appellate Division's reasonable assessment with its own. Although the Court harbors grave doubt about the confession's effect on the verdict, it cannot conclude that every fairminded jurist applying *Chapman* would necessarily find the error prejudicial.

Accordingly, Bethea has not demonstrated that the Appellate Division's harmless error determination was objectively unreasonable under AEDPA. *See Diaz*, 2023 WL 4363245, at *2–3 (concluding habeas petitioner failed AEDPA test because wrongly admitted crime scene evidence "could reasonably be considered

cumulative of other properly admitted, corroborating evidence" seen in eyewitness testimony); *McGhee v. Martuscello*, 24-326, 2024 WL 4891270, at *2–3 (2d Cir. Nov. 26, 2024) (summary order) (concluding habeas petitioner failed AEDPA test because it was not reasonable for every jurist to conclude undisclosed witness report was material given witness testimony, cell phone records, and surveillance video); *see also Casanova v. Campbell*, No. 22-1394, 2022 WL 16635440, at *6 (6th Cir. Oct. 12, 2022) (holding habeas petitioner failed AEDPA test because "reasonable jurists could not debate the district court's determination that the state appellate court's harmless-error determination [regarding admission of post-*Miranda* statements] was reasonable); *Frye v. Broomfield*, 115 F.4th 1155, 1165–66 (9th Cir. 2024) (reversing grant of habeas relief after concluding that fairminded jurists could determine state court's harmless error determination regarding petitioner's shackling during trial was not objectively unreasonable).

Because Bethea satisfies *Brecht* but not AEDPA, his due process claim does not warrant habeas relief.

## V. <u>CONCLUSION</u>

For the reasons above, I conclude—and respectfully recommend that Your Honor should conclude—that the instant § 2254 petition for a writ of habeas corpus should be denied in its entirety. But given my own grave doubts about whether admission of Bethea's confession and DNA evidence in violation of his *Miranda* rights constituted harmless error, I recommend that the Court issue a certificate of appealability as to Bethea's due process claim only. I recommend that no certificate

of appealability be issued as to Bethea's other claims, because reasonable jurists would not find it debatable that Bethea has failed to demonstrate by a substantial showing that he was denied a constitutional right. *See* 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000).

**SO ORDERED.**

DATED: White Plains, New York
October 20, 2026

VICTORIA REZNIK
United States Magistrate Judge

**NOTICE**

**Pursuant to 28 U.S.C. § 636(b)(1)(c), Rule 72(b) of the Federal Rules of Civil Procedure and Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts, the parties shall have fourteen (14) days from service of this Report and Recommendation to serve and file written objections. If copies of this Report and Recommendation are served upon the parties by mail, the parties shall have an additional three (3) days, or a total of seventeen (17) days, from service of this Report and Recommendation to serve and file written objections. Fed. R. Civ. P. 6(a), (d). Such objections, if any, along with any responses to the objections, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of the Hon. Vincent L. Briccetti, at the Hon. Charles L. Brieant, Jr., Federal Building and United States Courthouse, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.**

**FAILURE TO TIMELY FILE OBJECTIONS TO THIS REPORT AND RECOMMENDATION WILL PRECLUDE LATER APPELLATE REVIEW OF ANY ORDER OF JUDGMENT THAT WILL BE ENTERED.** ***See Caidor v. Onondaga County*, 517 F.3d 601, 604 (2d Cir. 2008).**

**Requests for extensions of time to file objections must be made to Judge Briccetti.**